Maxwell & Putnam vs. Railroad Co.

No. 11,924.

## MAXWELL & PUTNAM VS. SOUTHERN PACIFIC RAILROAD COMPANY.

A stipulation in a bill of lading, for the transportation of cotton in bales, by steamboat and a railroad as a connecting carrier for hire, that neither shall be responsible for damage which shall be occasioned by fire, does not exonerate either from responsibility from such damage as shall result from fire that is occasioned through the fault or ordinary negligence of the agents, servants or employees of the carrier.

Notwithstanding such a stipulation in a contract of affreightment, the carrier is bound to use due care and watchfulness in the protection and safe delivery of the goods of the shipper.

If the care demanded was not exercised the case is one of negligence, and a legal liability is made out when failure is shown.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Clegg & Quintero* for Plaintiffs, Appellees.

*Leovy & Leovy* and *J. P. Blair* for Defendant, Appellant.

*Howe, Spencer & Cocke,* as *Amici Curiæ*, submitted by brief:

Article 2751, Civil Code, subjects watermen and carriers to the same obligations and duties with respect to the safe keeping and preservation of the things entrusted to them as tavern keepers, whose obligations are defined in Arts. 2964 to 2971 inclusive, C. C.; Bailey vs. Stewart, 1 Rob. 410.

Art. 2754 C. C., is an almost exact reproduction of Art. 1784, C. N.

The limitation of liability enunciated by these articles is not in any way a derogation from the general rules applicable to all contracts. C. C. 1933; C. N. 1148.

Under the Roman law carriers for hire generally were uot put under any peculiar obligations which did not belong to other bailers for hire. 1 Domat, B. 1, Tit. 4, Sec. 8, Art. 5; Story on Bailments (4th Ed.), Secs. 29, 458, 459, 488.

By special edict by the Prætor, ship masters, inn keepers, and stable keepers were put under peculiar responsibility and made liable for all losses *not* arising from accidental or fortuitous events. The edict in terms did not extend to carriers by land.

Hennen vs. Monroe, 11 M. 579; Dig., 5,Lib. 4, Tit. 9, L. 1, Pothier Pand., Lib. 4, Tit. 9, N. 1, 7; 1 Domat, B. 1, Tit. 16, Sec. 1, Art. 4.

The law of England relating to the liability of common carriers was not derived from the Roman law. Nugent vs. Smith, Law. Rep., C. P. Div., Vol. 1, p. 423.

When the civil law prevails, the same rules found in the Roman law measure the carrier's responsibility. Its jurisprudence will not sustain the doctrine that the carrier is the insurer of the things entrusted to him; common carriers are not liable if the loss or damage·resulted from *cas* fortuit or *force majeure*. 5 Jour. de Palais, 476 (Paris), Vol. 21, 11 An.; 11 Jour. de Palais, 60 (Paris), Vol. 20, 13 An.; 11 Jour. de Palais, 189 (Paris), Germ. 1, 13 An.; 59 Jour. de Palais, 205 (Paris), 29 Avril, 1820; 59 Jour. des Palais, 217 (Lequesne C. Bonafon), 24 Fev., 1820; Hunt vs. Morris, 6 M. 676; Whitall vs. Brig Henry, 4 L. 223; Bailey vs. Stewart, 1 R. 410; Fisher vs. Brig, 8 N. S., 120; Darrell vs. Southern Pacific R. R., 47 An. 1455.

Argued and submitted December 6, 1895.
Opinion handed down February 10, 1896.

The opinion of the court was delivered by

WATKINS, J. The plaintiffs sue for the value of one hundred and ten bales of cotton which were destroyed by fire, while in possession of the defendant at its depot, or the vicinity thereof, in New Iberia, same having been delivered to the defendant for transportation over its road from the parish of Vermilion to the city of New Orleans.

The averments of the petition are as follows, to-wit:

"On the 22d of December, 1894, petitioners delivered in the parish of Vermilion, ninety-three of said bales of cotton to the steamboat Alice LeBlanc, to be delivered by said steamboat and connecting carriers to Stewart Bros. & Co. at the city of New Orleans.

"The said cotton was delivered to said steamboat in good order and well-conditioned. That thereafter, the said cotton was delivered by the Iberia & Vermilion Railroad Company and the said steamboat Alice LeBlanc to the defendant, through connecting carriers, at the station of New Iberia; and the defendant received the said

one hundred and ten bales of cotton into its possession and custody, and took charge of same for (safe) carriage and delivery to said consignee at the city of New Orleans.

"That the defendant loaded said cotton upon its cars at the station, and negligently suffered same to remain upon its sidings outside of the corpcrate limits, and the pacific protection of the town of New Iberia near by; exposed to fire, and other dangers, from the 22d of December, 1894, until the 25th of same month."

That on the 24th of December, 1894, a car load of *other cotton* in close proximity to that of the petitioners was ignited by fire, thus exposing theirs to danger of destruction by fire; that on the 24th of December, 1894, *another* car load of cotton in close proximity to petitioners, and upon the side track of defendant's road, was ignited, thus exposing theirs a second time to destruction by fire; and that, notwithstanding the happening of these two occurrences, " the defendant negligently and carelessly refrained from forwarding said cotton to its destination, or moving it to a less exposed and safer point."

"That on the 25th of December, 1894, the cotton of petitioners, which was as aforesaid in the possession, custody and control, and upon the side tracks of the defendant, was ignited and almost entirely consumed by fire; * * * and that thus, through the fault, negligence, carelessness, and the unlawful acts of the defendant, the en tire quantity of one hundred and ten bales of cotton were destroyed and lost to petitioners."

An itemized statement of the numbers, marks, weights and values of the bales destroyed is annexed to the petition; and judgment is prayed for the sum of $2507.63, as the value thereof.

Defendant's answer is a general denial, coupled with the following special defence, viz.:

That, on or about the 21st of December, 1894, the plaintiff entered into a contract with the Iberia & Vermilion Railroad Company for the transportation " by the said company and its connections, from Erath to New Orleans, of fifty-seven bales of cotton; and about said date, delivered to said company the said fifty-seven bales of cotton under and in accordance with said contract, to be carried thereunder."

Defendant then avers " that one of the provisions of said contract was, that neither said Iberia & Vermilion Railroad Company, nor

any of its connections, or transfer lines, which should receive and transport the said property should be responsible, among other things, for loss or damage caused by delay in transportation, fire, or any cause whatever not due to the company's negligence; all of which was expressly made a part of the terms and conditions of said bill of lading. And defendant now specially pleads the whole of said bill of lading and all the stipulations above recited  *  *  * as a contract binding on all parties under which  *  *  * it received said cotton."

That on the 22d of December, 1894, plaintiffs made a similar contract with' the steamboat Alice LeBlanc, for the transportation to New Orleans of ninety-three bales of cotton; and " that in said contract of carriage, dangers of fire and navigation were expressly excepted."

That defendant expressly pleads the whole of said contracts, and specially invokes the benefit of said exceptions in the aforesaid bills of lading as a good and sufficient defence against the plaintiff's demands.

Defendant admits· that after the receipt of· the one hundred and ten bales of cotton, under said bills of lading, as a connecting carrier, same was entirely consumed by fire—with the exception hereinafter stated.

''Defendant denies that the said cotton, at or before the time of its destruction, was placed in a dangerous position, or was unreasonably or avoidably delayed in transportation; and it specially denies, that it, or its officers, agents or employees, have been at any time guilty of any negligence, fault or omission with reference to said cotton, its placing, transportation, protection or otherwise, in any manner causing or contributing to its damage or destruction."

The representation 'is then made, that out of said cotton a small amount was rescued in a badly damaged condition; and that, as the best means of protecting the interests of all parties, it caused same to be sold, and it realized the sum of fifteen dollars, which is subject to the plaintiff's order.

That out of said one hundred and ten bales of cotton there was one bale saved, which was brought to New Orleans and tendered to the plaintiffs, and by them refused; that the same has been sold for the plaintiffs' account, and it is ready to surrender to them the proceeds thereof when same are ascertained.

On this statement the defendant claims its complete discharge from the plaintiffs' demands.

On the trial there was judgment in favor of the plaintiffs for two thousand five hundred dollars and sixty-three cents—the full amount claimed—and after an unavailing effort to obtain a new trial, the defendant appealed.

Thus stated, the question to be determined is, whether the defendant was guilty of negligence *vel non*—the receipt of the cotton and its loss and destruction by fire, while it was within the defendant's possession as connecting carrier, *in transit*, being admitted.

The bill of lading which was issued to the plaintiffs as consignors, by the steamboat Alice LeBlanc, contains the following stipulations, viz.:

" Shipped in apparent good order by M. and P. on board the steamboat called the Alice LeBlanc. * * * The following merchandise * * * to be delivered without delay, in like good order and condition, at the port of New Orleans (*the danger of fire and navigation excepted*) unto, as below," etc. (Our italics.)

This contract bears date December 22, 1894, and calls for ninety-three bales of cotton. Upon this contract is an endorsement that fifty-three bales were loaded on the car thus, viz.:

" (Fifty-three bales cotton) loaded on car.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"The rest of this cotton covered by other billings, 40 bales cotton."

Another bill of lading contains the following stipulations, viz.:

" Received by the Iberia & Vermilion Railroad Company, in apparent good order and well conditioned, of Maxwell & Putnam, fifty-seven bales of cotton. * * *

"It is understood and expressly stipulated that the liability of the Iberia & Vermilion Railroad Company shall cease upon delivery to its connecting lines of the goods, merchandise and produce mentioned herein, and that this company and its connecting lines are not responsible for damage to any article, etc. * * *

" The company, nor any of its connections or transfer lines which receive and transport said property, will not be responsible for damages from wet or rainfall while upon platform or in transit between points named within the bill of lading    \*    \*    \*    nor for damage or loss caused by delay in *transportation*, *fire*, or any cause

whatever *not due to the company's negligence*—all of which is made part of the terms and conditions of this bill of lading." (Our italics.)

This contract was signed by the agent of the railroad company and by the plaintiffs on the 21st of December, 1894, and the conditions and stipulations therein contained exhibit fully the contractual relations between them.

This is not a suit *ex contractu* for the enforcement of said covenant; but one *ex delicto* for the reparation of the loss which plaintiffs have sustained through the alleged negligence and fault of the defendant. Consequently, we can look into the contract only for the purpose of ascertaining the duty of care which the railroad company owed the plaintiffs under the circumstances of the case.

The case stands in the same position as though the contract for the transportation of the cotton had been primarily entered into between the plaintiffs and the railroad company.

An examination of the record has disclosed the following state of facts.

That there were shipped under bill of lading ninety-three bales of cotton by the steamboat Alice LeBlanc and fifty-seven by the I. & V. Railroad Company—one hundred and fifty bales in all, of which forty safely reached their destination.

The cotton was sampled previous to shipment, and sold by sample for two thousand five hundred and seven dollars and sixty-three cents; and in shipping the value was placed at that figure, less freight.

At the opening of the case, the defendant's counsel sought to show by testimony that on account of one of the company's bridges over Bayou Bœuf having been broken on the morning of December 23, 1894, a freight blockade at New Iberia was produced, and resulted in unavoidable delay of several days in the transportation of plaintiffs' cotton.

To the admission of such testimony counsel for plaintiffs objected that the defendant did not plead in his answer "the interruption of its traffic by an act of God, or an accident which prevented the railroad company from carrying out its contract to deliver the cotton;" and the court sustained the objection and rejected the proffered testimony on the ground " that the defence to this action is that they are exempted from the loss of cotton by

fire, by virtue of a clause in the bill of lading, except in the event that the fire was caused by their neglect. Testimony is offered to prove that they are not guilty of negligence, from the fact that some bridge was out of order and delayed its cars. That might be admitted if specially pleaded, so as to put plaintiffs upon their guard; although the court considers it as too remote a cause, and not sufficiently connected with the accident without putting plaintiffs on their guard."

Thereupon defendant requested the privilege of filing an amended answer covering the objection urged; but this request was refused and a bill of exceptions retained.

Subsequently, during the progress of the trial, the defendant offered the testimony of certain witnesses, for the purpose of showing the condition of its bridge over Bayou Bœuf, and the *cause* of the acccident thereto, but it was objected to by plaintiffs' counsel, for the reasons above assigned; and they were by the court sustained for the reasons heretofore assigned, and the additional reason "that the court considered that the mere fact of placing the cotton upon the sidings imposed upon the railroad corporation, the defendant herein, the duty of using due care and diligence to prevent its catching, or being ignited by fire; and that the duty of preserving and protecting the cotton from fire was equally imposed upon defendant," whether it was detained " in transit only for a short while, or, the road becoming blockaded from any cause, it was delayed for a great length of time, in order to exclude it from negligence."

To this ruling defendant excepted and retained a bill of exceptions.

We have intentionally combined these three rulings, as they are germane and essentially the same.

If the judge was correct in disallowing the proffered testimony, the defendant was disentitled to file an amended answer, embracing matter of substance, after the trial had begun. C. P. 419, 420; Gillis vs. Carter, 29 An. 698; Succession of Baum, 11 R. 314; Tucker vs. Lillies, 4 La. 298; Penny vs. Parham, 1 An. 275. *Per contra* as to immaterial matters. Rio vs. Gordon, 14 La. 418.

We are of the opinion that the defendant's failure to set out in his answer the existence, duration and cause of the delay in the transportation of the plaintiffs' cotton must necessarily result in the re-

jection of the testimony offered in support thereof. To decide otherwise would put the plaintiffs at a great disadvantage, and force them, on the spur of the moment, to litigate an important issue of fact for which they were wholly unprepared.

It appears that defendant's employees had placed the plaintiffs' cotton on open, or flat cars, and prepared same for transportation to New Orleans in pursuance of the aforesaid contract. In consequence of a freight blockade, or other cause, these freight cars were detained in the vicinity of the company's depot at New Iberia from the 23d to the 25th of December, 1894, and placed upon side-tracks, when the cotton was ignited by fire and totally consumed. Some cotton of *other persons*, upon cars of the company adjacent to those occupied by the cotton of plaintiffs, was ignited by fire on the evening of the 24th, but same was extinguished.

On the 25th one car load of plaintiffs' cotton was ignited and totally consumed by fire, at the hour of 1:30 P. M., and another car load was ignited and consumed at the hour of 6 P. M. of the same day.

The various witnesses for the defendant make the following statements, substantially, of the facts and circumstances appertaining to said fires, to-wit:

The company's superintendent of transportation says cotton that is loaded on flat cars is considered to be "exposed freight," and "requires greater protection and care in handling" than other freight, and "is carried through more rapidly."

That at the time the cotton caught on fire the car stood 600 or 700 feet from the depot.

One witness for the defendant says he saw the fire which occurred at 6 o'clock on the evening of the 25th of December, 1894. That he "was at a private residence about a quarter of a mile west of the depot. Near the side-track where he was there was a car loaded with 'exposed cotton,' and some colored boys were shooting Roman candles, hit the car and set the car on fire." That "as soon as some assistance got there he cut the car loose from the box car—the car load of cotton—and, with the assistance of others, he shoved it away from the boxes, to keep it from burning all the rest of the cars."

That he with others tried to extinguish the fire with buckets of water and by throwing some of it off, but did not succeed.

That the car was moved out on the salt mine track. Then he was

one hundred and fifty feet from the fire when it caught.    Had been there probably one hour and a half when the fire occurred.

That " at the time there were several young fellows out at a place having a good time."    That there was " quite a collection of people n that neighborhood having a good time—spending the evening, celebrating Christmas."

That there is a street or roadway near the switch-track where the cars stood, which is much used by pedestrians; and that the track is used as a sidewalk.

That when switching off the burning car load of cotton onto the salt mine track, it was not halted at the water tank near the depot. That the fire department of New Iberia turned out about three-quarters of an hour after the fire began, but before the burning car load of cotton had been moved.    That the hose was employed to cool down the fire, so that it could be moved; " and when it got cool enough, they hitched the engine to it."

Another of the defendant's witnesses states that he witnessed the fire on the evening of Christmas day.    That the cotton was fired by a Roman candle.    That he was passing by and saw some parties try-ing to extinguish the fire, and did not stop to render assistance.

Another witness for the defendant—a section hand—said he saw the evening fire, but lent no assistance.    Lived just across the street. That he was sitting on his gallery "putting on his shoes, fixing to go to church," when " a boy came running by shooting a Roman candle." That he said to him, " You will set that cotton on fire.    We have had trouble enough about the cotton."

That " just as the Roman candle fired into the cotton, it fired all at once, and he told his wife to bring him two buckets of water sit-ting in the kitchen, and he threw them on the fire."

He then makes, substantially, the same statement the first witness did, in reference to the efforts made to extinguish the fire, and the removal of the car.

This man's wife corroborated his statement throughout; and they both state positively, that if any " railroad man" was present at this fire they did not see him.

These two witnesses state that there were a great deal of noise and confusion that evening, preceding the fire.    Many people were shooting fire-crackers and Roman candles.    That there were many drunken people; and that all this could be seen from the depot.

Another of defendant's witnesses states that as he was riding by he saw "some little boys—a crowd—some on one side of the road and some on the other side of the road, the same side he was on, and they were shooting at each other with fire-crackers. Saw one of them shoot a Roman candle, and saw the ball strike the cotton. That his candle gave out and he threw it out and started to run." That "he passed by and took his ride around about three squares, and when he got back he saw a great big blaze, and the whole car was on fire. That he saw several persons trying to put the fire out."

It was the fire on the evening of December 25, 1894, that this witness describes.

Each one of these witnesses testifies to the facts which came under his immediate observation; and the record furnishes no countervailing evidence as to the origin of the fire. And with the exception of one—a section hand—none of these witnesses sustained any relations to the railroad company.

These witnesses, also, speak of having seen the fire which occurred at about 1:30 P. M. of the same day, on which another car load of plaintiffs' cotton was consumed, under strikingly similar circumstances to those of the evening fire. This fire occurred somewhat nearer to the depot than the latter one.

The only difference there is suggested between the two relates to the efforts which were made to *extinguish* the fire—the car of burning cotton *first* ignited was hauled to the water tank at the depot, and the hose turned on; while at the *evening* fire the fire department of New Iberia came to the rescue.

One Paul Herbert was called by the defendant and as a witness made the following statement, substantially, viz.:

That in December, 1894, he was a watchman for the defendant at New Iberia; and was, at the same time, a policeman for the town and a deputy sheriff.

That on the 24th and 25th of December, 1894, he saw negroes shooting fireworks, and that he "run a lot of negroes away *from around the depot* for shooting fireworks." That he did it several times. That the shooting of fireworks was worse "just outside of the limits of the town of New Iberia" than inside of it. That the town of New Iberia has only two policemen, and he does not think "they afford any protection at all, or very little." That he saw

them about the depot very seldom.  That in the performance of his duty he did not confine himself to the city limits, but went up and down the track.

That he *was not present when the fire of the afternoon of the 24th of December, 1894, ignited;* arrived a few minutes afterward.  That it was soon extinguished, and *after it was extinguished* he hired a negro to watch the car on which that fire occurred.

That he *was not present when the fire occurred on the afternoon of December 25, 1894.*  That he was going home to his dinner, and came back afterward and found the cotton all in flames—the whole car load of cotton was on fire.  It was then at the water tank.  That he had run off some boys who were shooting fire-crackers about half an hour previously.

That efforts were made to *extinguish* this fire without avail.  That he remained on duty that evening, but *was not present when the fire occurred at 6 P. M. on the 25th of December, 1894, and did not see it when it started.*

States that he arrived at the scene of this fire *about fifteen minutes after it began, " he thinks."*

That he "was somewhere around the depot when it started;" but he could not tell exactly the place, being "at first one place and then another."

But, he says, "the whole car was afire" when he arrived.  His statement of the occurrences which subsequently transpired corresponds with the statements of other witnesses.

He says that *after* the two fires of December 25, 1894, there were two extra watchmen employed *at the depot;* and that no other fires occurred, but that, *at the time of said fires, he was the only watchman that he was aware of*—the only one on duty.

He states that the two car loads of cotton which were *burned* on the 25th of December, 1894, were *outside* of the corporate limits of New Iberia; while that which was fired on the 24th of December, 1894, *and extinguished,* was *within* the limits of the corporation.

That the former were about fifty yards beyond the corporate limits, as nearly as he could judge; the evening fire being still further out.

That there was quite a number of lewd women who lived in that vicinity; and on this occasion some of them were intoxicated.  That it was at this locality that the boys had congregated, and engaged in shooting Roman candles.

States that he had full authority, as deputy sheriff, to make arrests all along the railroad; and had experienced no difficulty in preventing the shooting of fire-crackers, *when he was present.* That he had authority to arrest idlers and loafers. *That the town police afforded no protection,* and did not come around the defendant's premises day or night. *That he had no one to assist him; no one to relieve him.*

That the shooting of fire-crackers was promiscuous on Christmas Eve and Christmas Day, in and around the railroad premises at the town; but not in his presence. Rather more of it on the outside of the corporation. That it was a disorderly neighborhood where the fires occurred on the 25th of December, 1894—"very disorderly." There were negro dives all around there; all along the west end. That there was no other watchman than himself.

That both sidings and switch tracks were full of cars laden with cotton. "A large amount of cotton." "The track was blocked up."

That his jurisdiction extends about one mile each way from the depot.

*That up to the time of the fires* his principal business was "to look up cars and prevent the stealing of cane " which was in transit.

The foregoing is a synopsis of the testimony of the defendant's witnesses, exclusively; but that of the plaintiffs is only a repetition of many of the same details.

On this state of facts is the liability of the defendant made out ?

The responsibilities of carriers, as defined in our Code, are as follows, to-wit:

"Carriers and watermen are liable for the loss or the damage of things entrusted to their care, unless they can prove that such loss or damage has been occasioned by accidental and uncontrollable events." R. C. C. 2754 (2725).

And their duties are thus defined, viz.:

" Carriers and watermen are subject, with respect to the safe keeping and preservation of the things entrusted to them, to the same obligations and duties which are imposed on tavern-keepers in the title of Deposit and Sequestration." R. C. C. 2751.

And " an innkeeper is responsible if any of the effects are stolen, either by his servants or agents, or by strangers going and coming in the inn." R. C. C. 2967.

" The depositary is bound to use the same diligence in preserving

the deposit that he uses in preserving his own property." R. C. C. 2937. And " the provision in the preceding article is to be rigorously enforced * * * if it has been agreed that he shall have a reward for preserving it." R. C. C. 2938.

" When several persons have received the same object in deposit, each of them is bound to restore the whole." R. C. C. 2957.

Under the French Code the responsibilities of carriers are thus defined, viz.:

" They are responsible for the loss and average of things entrusted to them, unless they can prove that they have been lost and damaged by fortuitous circumstances, or superior force." C. N. 1784. The responsibilities of the carrier are essentially the same as they are defined in our Code.

*Vide* C. N. 1782, as compared with R. C. C. 2967.

The charge of plaintiffs' petition specially invokes the authority of the foregoing principles as entitling them to recover of the defendant the value of their cotton, which was destroyed by fire while in its hands under a contract of safe carriage and delivery to their consignees in New Orleans.

They allege that the defendant negligently and carelessly failed to deliver said cotton according to the terms of their contract, and negligently permitted same to remain on its side tracks and switches at New Iberia, for an unreasonable length of time—a period of three days—and that during this delay, "through (its) fault, negligence, carelessness and unlawful acts," the same was entirely consumed by fire. And the defendant, admitting the receipt and loss of the cotton by fire, avers that the contract exempted it from responsibility " for loss or damage caused by delay in transportation, fire, or any cause whatever not due to the company's negligence;" and specially denies that the cotton " was placed in a dangerous position, or was unreasonably or avoidably delayed " in transit, or that " its officers, agents or employees were at any time guilty of any *negligence* or *omission* of *duty* with reference to said cotton, its placing, transportation, or protection, or otherwise, in any manner causing or contributing to its damage or destruction."

The force and effect of the law, as modified by the contract, is fully alleged on the one hand and admitted on the other. The loss and resulting damage being admitted, the defendant carries the burden of proving that the loss was "not due to the company's neg-

ligence," nor to any "omission of duty," in "any manner causing or contributing" thereto.

The conclusion is that the defendant is responsible *ex delicto* for the loss plaintiff has sustained on account of its failure to preserve and safely deliver the cotton entrusted to its care, through its negligence or want of due care, notwithstanding it was exonerated *ex contractu* from loss occasioned by fire.

The right of carriers to thus limit their liability has been often recognized in other jurisdictions, and the rule has been adopted and frequently applied by this court.

In Insurance Company vs. Railroad Company, 20 An. 302, a case is reported which, in this respect, is quite similar to the instant one. But, said the court, the carrier, notwithstanding a special agreement relieving itself from liability for loss occasioned by fire, is liable for losses and injuries occasioned not only by gross but "ordinary negligence;" or, in other words, the carrier is bound to ordinary diligence.

In Roberts vs. Riley, 15 An. 103, it was held that, notwithstanding a special agreement restricting the liability of the carrier, it is "liable for carelessness and unskilfulnesss of the crew." Thomas vs. Ship Morning Glory, 13 An. 269; Price vs. Ship Uriel, 10 An. 413; Oakley and Hawkins vs. Gordon, 7 An. 235; Van Horn vs. Taylor, 2 An. 587; Peters vs. Railroad Co., 16 An. 222.

Recognizing defendant's right to thus restrict its liability, some of the adjudications of this court on the liability resulting from a contract of safe-carriage will be appropriate.

In Hunt vs. Morris, 6 M. 676, a case is stated of damages for the destruction of goods by fire, after they had been placed on board of a steamboat at New Orleans for transportation to Natchez —said loss being charged to the "negligence and misconduct of the master and those employed under him."

The court held that the responsibility of the carrier must be considered as that of a bailee for hire, and treated as such; he is answerable for "ordinary neglect, which is the omission of that care which every man of common prudence, and capable of governing a family, takes care of his own concerns."

Carriers "are excused by accident or overpowering force—*cas fortuit ou majeur*—whenever the first does not occur by their negligence, and when they do not unnecessarily go in the way of the lat-

ter; in other words, if they have used that due diligence in the performance of the contract which the nature of their situation requires.

"It appears, by the expressions of the Code, that the accident or overpowering force must be proven by the carrier, in order to excuse his failure to perform his undertaking according to agreement.   *   *   *   This rule gives to the plaintiff the advantage of implied or presumptive evidence of negligence on the part of the master and owners, which they are bound to disprove by showing due diligence."

In that case the court found that the fire occurred by reason of an uncontrollable accident, while the boat was proceeding on her way to her destination, "when the master and all his men on board were in the usual performance of their respective duties," and the defendant, therefore, was guilty of no negligence.

In Fisher vs. Brig Norvall, 3 N. S. 120, the action was for the value of thirty bales of cotton which had been sent to the levee in New Orleans to be shipped on the brig, and received by the captain, and, being suffered to remain on the levee over night following, same was consumed by fire—the cotton having been left exposed without any one to watch and take care of it.

The court held that to have been negligence of the master, and said "that was not the care which a prudent man would take of his own property, and the defendants must show due care to excuse them from the loss which has occurred. It is not a good excuse to say that it is not customary to place a watch over property such as this."

The principles announced in those cases have been frequently applied by this court, and they have been recognized and enforced in the recent case of Darrell vs. Southern Pacific Company, the present defendant. 47 An. 1455.

In that case we said:

"Our Code does not impose on carriers the responsibility incident to the relation under the common law. Rev. C. C. 2754.   *   *   *   But we do not understand that the Code has any tendency to relieve the carrier, if the loss is due to his act.   *   *   *   On this same line of defence, we are referred to the stipulations in the bill of lading furnished by the carrier to the plaintiff. That the carrier may, under certain restrictions, modify his liability, is admitted. It is hardly necessary to go into that discussion.   *   *   *   But it is

presumed it will be accepted (that) no stipulation will avail against a loss due to negligence, or imprudence of the carriers; or, in other words, *he can not stipulate against a peril prepared by himself.*"    (Our italics.)

" We have considered, too, the defence, that the plaintiff was familiar with the mode of transportation and took its risks.  We think it a more reasonable conclusion that he supposed defendants had assumed the risks arising from the position in which they chose to place the pile cluster, and its method of construction disclosed by the record.  The assumption of such risks, even if known to the plaintiff, would, it seems to us, require express proof."

Our decree reversed judgment for the defendant, and awarded the plaintiff two thousand eight hundred and sixty-eight dollars.

Applying these principles of law, as controlling the issues involved, it seems to our minds very clear that the defendant was guilty of negligence, and must respond to the plaintiff's demands. For the proof is clear to the effect that during the delay of the defendant's freight trains at New Iberia, for a period of more than two days, the safety of plaintiffs' cotton was imperiled by crowds of noisy, riotous boys, engaged in shooting Roman candles, and firecrackers in dangerous proximity thereto; and through this instrumentality, the two fires by which same was consumed were ignited —these occurrences having transpired on Christmas Day.  And it further shows that defendant did not furnish sufficient police protection for this "exposed cotton"—only one man being detailed for that purpose, and he being at the same time a deputy sheriff, a policeman for the town of New Iberia, and superintendent of the defendant's freight cars, with a beat of one mile each way from the depot.

The proof shows that he was furnished no relief or assistance of any kind, and that for the town of New Iberia there is but one policeman other than himself, and that this other one at no time comes to the defendant's depot or switches.  It further shows that the policeman, above mentioned, did not witness the *commencement* of either of the two fires by which the plaintiffs' cotton was consumed.  That notwithstanding he heard the alarm of *fire* given at the 1 o'clock conflagration on the 25th of December, 1895, *as he was going to his dinner, he did not turn back nor return for at least half an hour afterward, when he found the cotton in full blaze and nearly consumed*—the car on which the burning cotton was freighted

having been, in the meantime, detached from the train and moved down to the water tank at the depot.

And that, notwithstanding he heard the alarm of *fire* sounded on the evening of that day, at about 6 o'clock, *he did not reach the fire for fifteen or twenty minutes afterward*—the place where it occurred being between six hundred and one thousand feet from the depot, in the vicinity of which he claimed to have been; though the *cotton was fully aflame when he arrived, and sufficient time had elapsed for the fire department of the town to have received notification and sent their hose down and get it in operation, before he put in an appearance.*

These fires were discovered by people who lived close by and had no connection with defendant.

That the company was negligent there is no doubt.   The shooting of Roman candles caused the fire and was the *proximate* cause of same, while the delay of the train at New Iberia was the remote cause.   The *latter* may have been beyond the control of the company's agents, servants and employees, but the *former* was not.   The prevention of the fires was easily within their control by the employment of an adequate police force, and this they did not do.

Some reference has been made to a case decided by the *Massachusetts* court and one by the *Pennsylvania* court.

In the former—Denny vs. Railroad Co., 13 Gray, 481—the court said:

"It is said to be an ancient and universal rule, resting upon obvious reasons and justice, that a wrong-doer shall be held responsible only for the proximate and not the remote consequences of his actions," and held that "the liabilities of common carriers are regulated and governed by it."   Citing 2 Parsons on Con., 456, 457; 2 Greenleaf on Ev., Sec. 256; Story on Bailments, 586; Angell on Carriers, 201; Morrison vs. Davis, 20 Penn. St. 171.

But the facts of that case are quite dissimilar to those of the instant case.

"The rise in the waters in the Hudson," said the court, "which did the mischief to the wool, occurred at a period subsequent to this—the *storing* of the freight at the terminus of the road—and; consequently, was the direct and proximate cause to which that mischief is attributable.

"The negligence of the defendants was remote; it had ceased to operate as an active, efficient and prevailing cause as soon as the

wool had been carried on beyond Syracuse, and can not, therefore, subject them to responsibility for an injury to the plaintiffs' property, resulting from *subsequent, inevitable accident*, which was the *proximate* cause by which it was produced. It is to the latter, only, to which the loss sustained by him is attributable." (Our italics.)

" In Morrison vs. Davis, *supra,* the principle of law maintained was that carriers are answerable for the ordinary and proximate consequences of their negligence, and not for those which are remote and extraordinary; and the court held ' that the proximate cause of the disaster was the flood, and the fault of having a lame horse was a remote one, which, by concurring with the extraordinary flood, became fatal.' We assume that the *immediate* cause had the character of *inevitable* accident; but that this cause could not have affected the boat had it not been for the remote fault of starting with a lame horse."

While not controlling, those decisions serve to illustrate defendant's liability in this case—the terms of the two cases being reversed. For in the instant case the fire was the *immediate* cause of the destruction of the plaintiffs' cotton, and it was under the control of the defendant's agents, servants and employees, and their immediate supervision, and was not, therefore, in the nature of an inevitable accident. The delay in the transportation of the cotton was only the remote cause of the accident; and, for the purposes of this case, it may be assumed that it was in the nature of an unavoidable accident, having been caused by broken bridges.

Accepting the theory advanced by common law authorities, with regard to the responsibility of common carriers, that they are deemed to be " private individuals, who incur no responsibility beyond that of an ordinary bailee for hire, and answerable only for misconduct and negligence (Clark vs. Barnwell, 12 Howard 272; Railroad Co. vs. Rives, 10 Wallace, 176; Railroad Co. vs. Lockwood, 17 Wallace, 361), yet we find that doctrine not incompatible with the opinion we have expressed on the subject.

For in Meyer vs. Railroad Co., 41 An. 639, we affirmed a judgment against the company for the destruction by fire of cotton deposited upon its platform, one of its trains having negligently failed to take and carry same to its destination according to contract.

Mr. Cooley puts the proposition thus: "If the care demanded was not exercised, the case is one of negligence, and a legal liability is made out when the failure is shown." Cooley on Torts, p.

In Liverpool Steam Co. vs. Phœnix Ins. Co., 129 U. S. 397, the question we have considered was very elaborately examined, and all the authorities compared and digested, and the conclusion of the court was that the stranding of the vessel was " the direct result of the negligence of the master and officers of the steamer "—notwithstanding the limitation of liability under its contract of affreightment, same not exonerating them from the obligation of due care in the performance of their duties. The principles of that case are strictly applicable to the facts of this case.

Judgment affirmed.