ELLIS Judge:
(dissenting).
The facts in tliis record show that Bayou Rawls, which rims through the City of Opelousas, is one of two main arteries of drainage in the city. At the scene of this accident and fire, it runs under Landry Street at approximately a 45-degree angle, and it has a large concrete culvert which in reality is a bridge across Bayou Rawls at this point. This concrete culvert is approximately 67 feet long and 12 feet wide and is divided by a solid concrete wall in the center which runs from the ground to the top of the culvert its entire length, thus dividing this culvert into an east and west side, the latter being nearer the city of Opelousas, and the former that part nearest Port Barre. The concrete partition is 65 feet long and the east and the west partitions are 6 feet wide and 6 feet high. To the east of this bridge across Bayou Rawls or on Landry Street is located the Billups Petroleum Company filling station and in close proximity thereto is also a Gulf Station and a Mobile Station. The drainage on this side of Landry Street goes into a storm sewer and then into an underground drainage system which then goes a distance of 100 feet and drains directly into the east partition of the bridge or concrete culvert. This was the only drainage system that could be used by the two filling stations. As a matter of fact, it may be assumed that they were supposed to use this underground drainage system in order to reduce the hazards around the filling station and on the street. It is also shown that these filling stations daily washed down with water their premises in order to rid them of any spilled gasoline, grease or oil and also to keep them neat and clean. The Gulf station daily used kerosene to remove grease from their premises which was all washed with their water hose into this drainage system and went into the east side partition of the concrete bridge or culvert. It is further definitely shown that the Billups manager did not know where this underground drainage system led or that it drained into Bayou Rawls under the concrete bridge or culvert. It is further definitely and without question of a doubt shown that this water drained to the north under this concrete bridge or culvert in Bayou Rawls, however, it is also estab *551 lished with definite certainty that the east side partition had been allowed through the years by the City of Opelousas to become completely stopped up on the north and south ends and only served as a drainage system in the event of a flood. The pictures show the concrete slab and dirt and refuse that had been allowed to build up on the entry of the east side partition. The dam on the south and north ends of this east side partition was such that it formed a lake or pool of water 65 feet in length and approximately 10 inches deep at all times. There is no testimony of any flood sufficient to overflow into the east side partition other than mention was made of one about the time of Hurricane Audrey. One is safe in stating that for many, many months and possibly several years the grease, kerosene and gasoline had been allowed to accumulate in this east side partition. Of course, gasoline in time would evaporate, therefore, anything that drained into the east side partition was trapped and remained there unless it evaporated or until a flood removed it. Also the officials of the City of Opelousas were well aware of this condition and an attempt was made to state that the east side partition was not needed for drainage as the west side partition handled all the ordinary conditions of drainage. This was clearly disproven by the record and is rather ridiculous on its face, for they would never have put two partitions. The east side partition was a part of Bayou Rawls, and had been formed by nature through the years and was necessary for proper drainage. If it was not necessary to a proper drainage it should have been filled up and no underground drainage should have been allowed to run into the east side partition where the dangerous materials or substances such as gasoline, kerosene, oil and grease were daily drained into this trap to the knowledge of the proper officials of the city of Opelousas but not to the knowledge of the representatives and employees of the three filling stations.
On the morning of Saturday, November 2, 1957, between seven and seven thirty, an employee of the Billups Petroleum Company was transferring gasoline from a storage tank to a service tank at the station on Landry Street. The intake pipe was located on the graveled section on the station premises about three feet from the paved slab of the filling station. The employee had stepped into the office to fix a ticket for gasoline, and upon his return saw that the gasoline was running out of the pipe and had run the three feet to the concrete slab and then on the concrete slab from two to three feet. He turned on the water hose and washed this gasoline into the street gutter which led to the storm sewer and underground drainage into the east partition or concrete bridge across Bayou Rawls on Landry Street. The majority opinion frankly stated that it is not proven how much gasoline ran over onto the concrete apron and was washed into the drain, however, it was assumed that it must have been a large quantity from the nature of the fire and also that he washed it down for thirty minutes. I do not understand the testimony to mean that the Billups man took thirty minutes to wash the gasoline off of the station. When asked what he did right after the gas spilled he testified:
“A. Well, I turned the water on and give it a good watering down. In fact I opened the water spigott there. It was right there where the gas was running and then I went and got the hose, so I used the hose, if it was already hooked up, I done forgot and washed it down good there, and left the water run there for, oh, I guess about thirty minutes.”
As I understand the above testimony, he quickly washed the gas down and then left the water running for thirty minutes so that it would all drain off of the street and into the underground drainage sysem which was the proper precaution to take under the circumstances. Regardless of the amount of gasoline spilled, in my opinion it doesn’t *552 make any difference to a proper decision in this case. In any event the gasoline was thoroughly washed from the concrete portion of the filling station and out into Landry Street and off of Landry Street into the sewer where it was supposed to be placed.
Sometime within the next hour the city employees, among whom were Boutte and Williams, arrived at the Bayou Rawls concrete bridges on Landry Street in order to continue cutting grass and cleaning out Bayou Rawls, although it is definitely shown they had no intention of removing the dam on the east side partition. Boutte and Williams went under the east side partition of the culvert or bridge with their spades and shortly thereafter an explosion, which could not have been very loud according to the descriptions of the other city employees and witnesses, as well as a fire, took place in the east side partition. As a result of the explosion and fire, Boutte and Williams were killed. The fire caused a lot of black smoke which the expert petroleum engineer testified was caused from oil and grease rather than from any gasoline as the latter has very little if any smoke when it burns. The very nature of this fire is proof that the burning material was an accumulation of many months of oil, grease, kerosene and gasoline which daily was allowed by the city officials to become dammed up in the only drainage system on Landry Street at this point which these filling stations were supposed to use in order to get rid of such waste materials.
The City Fire Department of Opelousas immediately came to the scene and used the nozzle on their hose which formed such a dense spray of water or mist that it held the heat back so that they could approach close to this fire which was contained entirely on the east side partition. The west side never did catch fire or burn because the water was flowing normally from south to north on this side of the partition. At this point it might also be well to mention, as it is very important, that there was a filling station which had a grease rack whose wasted grease, oil and gasoline drained into Bayou Rawls but went inter the west side partition. Had the west side partition been in the same condition as the east side partition, it would have burned, and it is equally true that had the east side partition been open as was the west side partition, none of this accumulated oil, kerosene, grease and gasoline would have been there at the time these employees of the city came to clean Bayou Rawls of grass and other like material that might obstruct the flow.
As to the cause of the fire or ignition of the gas fumes and oil and kerosene which were trapped by these two dams under the bridge, it is definitely shown that a match was the only thing that could have ignited this material. It is shown that after the fire the spades of these two deceased workers were resting against the side of the concrete culvert with their points in the ground. It is possible but not probable that they could have both been blown in the very position that anyone using them would have placed them if he wanted to put them within easy reach and do something else for the time being. In addition, the deceased Boutte was found under the bridge about four feet from the south end in the east side partition and clutched in his left hand was a box of matches. The funeral home that prepared the body removed these matches from his clutched left hand and kept them around for quite a while but at the date of the trial had destroyed them. There is no doubt, however, as to this fact.
We also have the testimony of an employee of the Williams Funeral Parlor who removed the body of Williams from the east partition of the concrete bridge and which was located about eight feet from the body of Boutte. This witness stated that he couldn’t say whether the deceased Williams had anything in his hand or not “ * * * but there was some cigarettes like floating in the water.”
As to what the employee of the defendant should have done when he discovered *553 the gasoline had overflowed and was running on the concrete apron of the station we have the testimony of every witness to the effect that they would have done the same thing which he did, viz., have washed the gasoline down with water from the hose, into the gutter and thence into the underground drainage system. We have the testimony of one Nolan, who was a member of the fire department of the city of Opelousas, who stated that he went to this fire and upon being informed that two men were missing said, “I can’t do anything about it until I cool it down. They had a lot of tar and stuff burning under the bridge.” This witness stated that while they had special chemicals in the fire department to wash gasoline down with, that on the occasions when it was necessary to dispose of gasoline that had been spilled it had been washed down with water. He further testified as follows:
“Q. Now if you went over there you would flush this water down, is that correct, I mean this gasoline down? A. Yes, we would.
“Q. And necessarily, it would have to drain into the underground drainage, is that right? A. That’s right.
“Q. And if the manager of the Billups Station had called you that morning to flush that gasoline down, you would have done the same thing he did, in flushing it down into that drain, is that correct? A. That’s right.
“Q. And you had no knowledge as to where that drain went? A. No, I didn’t know.
“Q. So if you had flushed it down, the gasoline would have went on as it did on that particular morning? A. That’s right.

“Q. Mr. Nolan, as a practical matter, you have always used water to wash down gasoline, haven’t you ? A. That’s right.
“Q. And that is what you did on the day of the fire when you went under from the north end, you used water? A. Strictly water or I used a fog nozzle to get in.
“Q. Yes, but that fog nozzle is strictly water to create a spray ? A. That’s right.”'
This is the only witness who mentioned chemicals, however, we have the testimony of an expert witness who was a consulting petroleum engineer who testified that he did not know of any chemical that neutralized gasoline; that the chemicals that are used in general in that connection would be something to generate carbon dioxide, which would have the effect of quenching a fire or smothering a fire. This is evidently the same kind of chemical which Mr. Nolan was talking about, however, there was no need to use it on the gasoline at that time as there was no fire around the filling station, and it would not prevent it from catching on fire after it was in the east side partition.
This witness also testified that the best manner for an attendant at a gasoline station to handle a spillage of gasoline is to wash it off with water. He also testified that the fact that no fire came back in the underground drainage showed that the employee of the defendant company had properly washed all the gasoline from the underground drainage system.
For a short summarization of the above facts, we have a case in which a relatively small amount of gasoline was spilled, according to the facts, probably five or possibly ten gallons. The intensity of the fire and the volume of black smoke was due to the oil, grease, kerosene that had been entrapped in the east partition for many months as it drained from the three filling stations, and also from tar which evidently had been left there when the culvert and bridge were constructed as there is no evidence whatsoever that the tar came from the defendant filling station or any of the other two filling stations in close proximity. After the spillage of the gasoline we then have undisputed and positive testimony that the attendant at the defendant station used safe, approved and proper method of thor *554 oughly removing the spilled gasoline by washing it down and then allowing the water to run for thirty minutes thereafter in order to thoroughly remove all gasoline from the apron and the street and wash it into the open drain with a sufficient amount ■of water. There is no question but what this open drain leading to the underground ■drainage system in which this gasoline was washed was the main and only drainage provided in that locality or vicinity, and that these three filling stations were, in effect, invited to use this drainage system. In fact, if they allowed any water or any gasoline to be washed down there was no way to prevent it from going into this drainage system as the street and aprons of the grounds of the property owners along there were fixed so that it would drain into this underground drainage system. The next important fact which was definitely proven was that the defendant and the attendant employee who safely removed the gasoline after it spilled had no knowledge whatsoever that the underground drainage in that vicinity went into Bayou Rawls under the bridge. The next important fact necessary to a proper decision of this case is the absence of any knowledge on the part of the defendant or his employee as to the dangerous condition which the city of Opelousas allowed to remain under the bridge in the east partition where all the drainage had to first fall from the locality of this defendant service station and other service stations and property owners on the same side of Landry Street. The next fact is the definite proof that both ends of the east side partition were stopped up by concrete, dirt, debris and had formed a dam on the south and north ends. The dam on the south end was much higher than on the north end, which was only natural as the water was flowing from the south to the north and built this dam up as it was blocked and forced to go through the west entrance. The next important fact is the unquestioned testimony that this entrapped water 65 feet long by 6 feet wide and approximately 10 inches deep, together with the oil, grease, gas, kerosene and any other products used by filling stations, could only get out by evaporation or in a flood stage, and the record is void of any proof of any recent floods, and therefore, there was a long accumulation of this inflammable and combustible material as well as tar in the east side partition on the date of the fire. The next important fact which I believe is definitely proven is that the two employees intended to smoke a cigarette and placed their spades against the concrete wall and one of them struck a match. This proof supports the conclusion that Boutte struck the match. There was a mild sounding explosion, according to the other employees of the city working in and under the bridge at the time, and immediately flames and then dense smoke came from under the east side partition. Another important fact is the lack of any fire on the west side where the drainage was open, although a filling station in the immediate vicinity dumped all of its grease from its grease rack and the wasted oil and all other materials that are wasted around a filling station into this canal. We can only presume that it was carried away by the current which was flowing freely on the west side on the day of this explosion. There is no testimony that it did not so flow at all times, and would not have so flowed on the east side partition had it been open.
I am in accord with the arguments advanced and the jurisprudence cited by counsel for the defendant in his brief on the. question of the lack of actionable negligence by Tillson, the employee and attendant in charge for the defendant company on the day of the accident, as proven by the action taken by Tillson after the spillage of the gasoline and I quote:
“As stated before, the actions of Tillson must be considered in the light of what a reasonably prudent man would have done under the same circumstances prior to the said accident. There are many cases in our jurisprudence which clearly indicate the action taken by Tillson after the *555 spillage of the gasoline did not constitute actionable negligence. In the very recent case of Brown vs. Liberty Mutual Insurance Company, et al., [234 La. 860] 101 So.2d. 696, decided by our Supreme Court in 1958, we have an action for damages by a father for injuries received by his eighteen month old child who was run over by the defendant while leaving the father’s premises. The trial court found for the defendant and its decision was reversed by the First Circuit Court of Appeals. The Supreme Court then reversed the judgment of the Court of Appeals and reinstated the judgment of the Lower Court. In overruling the decision of the Court of Appeals, the Supreme Court stated:
“ ‘We think the Court of Appeal erred in that it imposed on Devall a higher standard of care than justified by the facts of the case. Liability for damages under Art. 2315 of the [LSA] Civil Code is founded upon fault and whether or not fault exists depends upon the facts and circumstances presented in each particular case. In determining fault, a commonsense test is to be applied — that is— how would a reasonably prudent man have acted or what precautions would he have taken if faced with similar-conditions and circumstancesf The degree of care to be exercised must always be commensurate with the foreseeable dangers confronting the alleged wrongdoer. (Italics ours.)’
“After the spillage occurred, there devolved upon Tillson an affirmative duty to take precautions to remove the gasoline from the apron of his station. Unquestionably, it was foreseeable at this point that injury or damage could have resulted from his act and he' could anticipate a probable fire or ex-> plosion from a spark or a carelessly thrown match on the concrete where the gasoline flowed. If Tillson had failed to take any precaution for the removal of the gasoline at this point, and, if someone had been injured while near the gasoline, his failure would have been actionable negligence. The danger at this point was such that a reasonable man would hav£ foreseen and anticipated possible harm. Tillson anticipated this danger and the undisputed evidence is that he did a thorough job of removing all of the gasoline from the apron of his station. In addition, he ran enough water into the underground drainage system to remove all gasoline for at least one hundred feet to the point where it emptied into the east side of the culvert under Landry Street. This is evidenced by the testimony contained in the record to the effect that at no time after the original fire and/or explosion did the fire traverse the underground drainage line back to the catch basin and onto the apron of the station. * % íjí ”

“The action of Tillson immediately following the spillage of gasoline was that of a very prudent and cautious man. He did everything humanly possible to insure the safety of his patrons and premises. The subsequent developments were such that no man could possibly have foreseen or anticipated them. The circumstances surrounding the fire and/or explosion were of the type that occur no oftener than once in a lifetime.
“ ‘ * * * it is not sufficient that injury is merely possible. A person is not bound to foresee and provide against casualties which are unlikely, wholly improbable, extraordinary, or, in the light of human experience, beyond the range of probability, or only remotely and slightly probable, or which would not occur except under circumstances which are exceptional, unusual, or abnormal; and a failure to anticipate or guard against a remote possibility of accident does not consti *556 tute actionable negligence.’ 65 C.J.S. Verbo Negligence, Sec. 5(b) p. 361. (Italics ours.)”
3 am also of the opinion that the case 'of Globe and Rutgers Fire Insurance Company v. Standard Oil Company of Louisiana, 158 La. 763, 104 So. 707, 708, decided by our Supreme Court is apposite and contains a clear, concise statement of the settled jurisprudence and rules of law applicable in arriving at a proper decision under the facts of the case at bar. I realize that the majority has attempted to distinguish this case and state that it is inapplicable because in the cited case only a small quantity of gasoline was supposed to have been spilled, whereas in the case at bar a large quantity was supposed to have been spilled. I cannot see that this makes any difference factually. When a match was thrown into the small amount of gasoline .spilled in the cited case, it caused a fire which burned up an entire store and its contents and had two men been trapped in the store and burned to death it would be no different other than the greater amount of property damage caused by fire from the small amount of gasoline as contrasted to the supposedly large amount spilled in the case at bar. Be this as it may, the main applicability of the case is the rules of settled law stated therein which must be used in determining the proximate cause of the fire and resulting death of the two deceased in the case at bar.
In the Globe case, supra, the uncontra-dicted facts were that the defendant’s agents were delivering gasoline from a motor tank truck and had inserted the outlet pipe of the tank truck into the inlet pipe of the underground tank located near the Bogalusa Store’s company building. The inlet pipe was approximately four feet distance from the gallery of the store and defendant started the gasoline to run into the said underground tank. While doing so, he took the pipe transferring the gasoline from the truck to the tank out of the inlet pipe causing gasoline to run over and onto the ground adjacent to the store building. The defendant allowed this spilled gasoline to remain on the ground in close proximity to the store, unprotected and continued to let the gasoline to run into the tank. While this was going on, he went into the store to get a receipt signed. During his absence, a third party, who was unknown, threw a lighted match adjacent to the spilled gasoline causing it to ignite and destroy the entire store and its contents. The defendant’s agent testified he delivered this gasoline in the usual way and admittéd that he had spilled the gasoline near the inlet pipe. We quote the following from the decision of the court:
“Our conclusion is that plaintiff has not made out its case. We see no evidence of any negligence on the part of defendant’s agent;' for we recognize that large volumes of liquids (300 gallons here) cannot be handled without spilling small quantities thereof at times. And to convict a vendor of gasoline of negligence under such circumstances would amount to making him an insurer towards all against the dangerous properties of that fluid.
“We do not mean to say that a handler of gasoline is not required to handle it with some care, and need not take precautions against spilling it around. Indeed, his own safety requires him to do so; but spilling small quantities thereof is unavoidable, and gasoline is an article of prime necessity today; so that the public is bound to share some small part of the risk of handling it, to wit, that part of the risk which is unavoidable.
“The fact of the matter is that the direct and proximate cause of this fire was the throwing of the match in proximity to the inlet pipe of the underground tank, around which, when open, there was bound to be either gasoline or gasoline vapors, and the act of defendant’s agent, even if we call it negligence, was only the remote cause thereof. For the fool *557 hardy act of throwing a lighted match near the intake pipe of a gasoline tank at a time when gasoline was being poured into it was not to be anticipated.
“ ‘The question is not whether it was a possible consequence, but whether it was probable, that is, likely to occur, according to the usual experience of mankind. That this is the true test of responsibility applicable to a case like this has been held in very piany cases, according to which a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable. A high degree of caution might, and perhaps would, guard against injurious consequences which are merely possible; but it is not negligence, in a legal sense, to omit to do so. * * * ’ Stone v. Boston & Albany R. R. Co., 171 Mass. 536, 51 N.E. 1, 41 L.R.A. 794, and .authorities there cited.”
The Globe case, supra, was followed by the Orleans Court of Appeal in the case of Palmetto Fire Insurance Company v. Clarke Garage Co., 6 La.App. 420. In this case the Orleans Court of Appeal refused to allow recovery to the plaintiff as the result of an automobile being destroyed while being serviced at the defendant’s garage. The facts show that one of the defendant’s employees filled the tank of a car with gasoline and allowed it to overflow and run onto the floor of the garage near and around the automobile in question. He made no attempt whatsoever to wash the gasoline away. A customer of the garage then threw a lighted match on the floor and ignited the gasoline causing the car to burn. In arriving at a decision the court stated:
“We have been very materially assisted in the decision of this case by the very able opinion of the Honorable Val J. Stentz, Judge of the City Court, from whom this appeal comes. He said in part:
“ ‘The only facts of negligence imputed to the defendant were the spilling of the gasoline on the floor of the garage and in not posting signs of “no smoking”. A garage keeper is not an insurer of the automobiles left in his charge to be cared for, but he is bound to use reasonable or ordinary diligence in their care and keeping and they are bound to take the same care as a prudent man ordinarily takes of his own property. Berry on Autos, Sec. 1403-a, C.J.S. 42 [Husband and Wife], p. 85; R.C.L., Sec. 21, p. 94.
“ ‘In the absence of a special statute on the subject or a special contract, a garage keeper is bound to exercise reasonable care, but does not insure a vehicle in his custody from damages from fire in the garage. He is liable for the injury only when his negligence has contributed thereto.
“ ‘Huddy, Sec. 243: * * * “Ordinary care requires only that precaution be taken against occurrences that can be and should be foreseen; but does not require that one should anticipate unusual and improbable though entirely possible, occurrences.” [Rouseo v. Gauche-Connor Co.] 8 Orl[eans] App. 216. Nor to anticipate when persons will be negligent. Damonte vs. Patton, 118 La. 530, 43 So. 153; Ford vs. Tremont Lbr. Co., 123 La. 742, 49 So. 492. Nor do I believe that the spilling of a little gasoline-in a garage, while filling an automobile tank, is negligence per se; it is merely incidental to the busi *558 ness. But if it were a negligent act, it was only a remote cause of the fire, the direct and proximate cause being the throwing of the lighted match. Globe & Rutgers Fire Ins. Co. of N. Y. v. Standard Oil Co. of La., 158 La. 763, 104 So. 707.
“ ‘It is said to be a universal rule resting upon obvious reasons and justice that a wrongdoer shall be held responsible only for the proximate and not the remote consequences of his actions. [Denny v. New York Central R. Co.] 13 Gray [Mass.] 481; Maxwell & Putnam vs. Southern Pacific R. R. Co., 48 La.Ann. [385] 402, 19 So. 287.’

“The damage in this case was not caused immediately by the spilling of the gas upon the floor which was a remote cause, but was occasioned directly and proximately by the negligent act of the person who threw the lighted match. (Italics ours.) Farque v. Gulf States Utilities Company, Inc., [La.App.] 140 So. 90.”
In the case of New Orleans & N. E. R. Co., v. McEwen & Murray, 49 La.Ann. 1184, 22 So. 675, 680, 38 L.R.A. 134, our Supreme Court laid down and approved of the following rule of law:
« * * * jn or(jer ^ render a person chargeable in damages for an act of omission or commission on his part, the act complained of must have been the proximate cause of the damage. In Huber v. Railway Co., 66 N.W. 708, the supreme court of Wisconsin, affirming what had been previously declared by it in Block v. Railway Co., 61 N.W. 1101, said: ‘The negligence is not the proximate cause of the accident, unless, * * * under all the circumstances, the accident might have been reasonably foreseen by a man of ordinary intelligence and prudence. It is not enough to prove that the accident is the natural consequence of the negligence. It must also have been the probable consequence. Atkinson v. Transportation Co. (Wis.) 18 N.W. 764; Barton v. Society (Wis.) 52 N.W. 1129; McGowan v. Railway Co. (Wis.) 64 N.W. 891. A mere failure to ward against a result which could not have been reasonably anticipated is not actionable negligence.’ * * * tf
If our courts have consistently refused to attach liability in cases such as the Globe and Palmetto Fire Insurance Company cases, supra, where the gasoline spilled was knowingly allowed to remain as a hazard, and as a result of a third party having thrown a match in or near the gasoline and igniting it causing damage, because the spillage of the gasoline was held to be only a remote cause, and the direct and proximate cause was the throwing of the match in or near the spilled gasoline, how could any liability attach to the defendant under the facts of this case where there are two direct, proximate and intervening causes of the fire and resulting deaths of the deceased.
In the case at bar the direct and proximate cause was due to the gross negligence of the City of Opelousas in allowing the east side partition to remain with a dam at the south and north ends so as to entrap any and all combustible materials draining into the catch basin on Landry Street, placed there by the city for such a purpose with its underground outlet emptying into this east side partition trap. The defendant had no knowledge, actually or indirectly, as to the location or extent of the underground drainage system after it left the catch basin on Landry Street in the vicinity of this filling station, nor of the dangerous and defective condition of the drainage in Bayou Rawls under the east side partition of the concrete culvert and bridge across the canal and Landry Street. The defendant company cannot be charged with the knowledge that the probable consequence of the washing down of the gasoline into the *559 drainage system provided by the city would end in its entrapment under the east side partition of the culvert. Had it been open and draining as was the west side, the testimony shows there would have been no explosion and fire. Neither was it foreseeable or to be anticipated that a match would or could be struck so as to ignite the very gasoline washed into the underground drainage system. In addition, if the deceased were to be considered, and they must be so considered in the absence of any testimony, as mentally competent, as to be guilty of contributory negligence, they are so convicted by the facts. All the other employees who testified smelled the gasoline fumes and some stated they were in a hurry to finish and get away from the fumes. In addition it was easy to see the trap under the east side partition as it was clearly visible as well as the oil, grease and tar which was present as evidenced by the character of the fire.
As previously stated, under the facts of this case and the jurisprudence and the rules of law which must be applied, the defendant was not bound to anticipate, nor foresee, that the underground drainage system provided by the city of Opelousas, emptied into a trap caused by the negligence of the city of Opelousas in failing to perform a duty imposed upon it by law, and that the gasoline placed in this underground drainage system would be so exposed that a person could strike or throw a match into it and ignite it. Any negligence of the defendant, if it existed, was far too remote to be a proximate cause of the death of the deceased in the case at bar. The direct and proximate cause of the death of the deceased in this case was the trap which existed under the east side partition and culvert, and the striking of a match. However, I am of the opinion that the sole and proximate cause of the fire was the failure of the City of Opelousas in its legal duty by allowing such a trap to form and remain.
I will now direct my attention to the majority opinion and any remarks or apparent criticism on my part are made with the greatest respect for those who subscribe to the views expressed therein. In this opinion it is stated that it appears that in the recent case entitled Fontenot v. Magnolia Petroleum Company, 227 La. 866, 80 So.2d 845 “would be controlling of the issues with which we are presently concerned.” I am unable to agree with this statement for I think the case is totally inapposite. The Supreme Court very frankly stated that:
“We are unwilling to follow any rule which rejects the doctrine of absolute liability in cases of this nature and prefer to base our holding on the doctrine that negligence of fault, in these instances, is not a requisite to liability, irrespective of the fact that the activities resulting in damages are conducted with assumed reasonable care and in accordance with modern and accepted methods.
“It follows that clearly the plaintiffs in this instance do not bring an action in tort but one that springs from an obligation imposed upon property owners by the operation of law thereby granting to other property owners the maximum enjoyment.in the liberty and use of their property. To hold otherwise would grant the right to conduct operations of a nature as is here involved, and upon its being shown that such activities are conducted in full accord with accepted modern methods, no liability may attach therefor in favor of persons injured.”
Thus we see that the case was decided because of its nature upon the doctrine of absolute liability and the court specifically based its holding “on the doctrine that negligence or fault, in these instances, is not a requisite to liability, * * * Also that the plaintiffs did not bring an action in tort in the cited case. In the case at bar it is a tort action based completely and absolutely for a finding of liability upon the doctrine of negligence or fault as a proximate cause.
*560 Again in the majority opinion it is stated that the city of Opelousas could not foresee that a substantial amount of gasoline would be spilled in this culvert. The facts show that the city of Opelousas knew or should have known that this trap existed, they knew where this drainage system emptied, they knew that there were filling stations that drained their water and waste material into this -drainage system at this point and furthermore their own employees testified that they would have washed this gasoline without regard to the amount into this catch basin and drain had they been called upon to do something about it.
As to the law cited from Vol. 65, C.J.S. Negligence § 111, p. 697 in the majority opinion it is certainly sound and when applied to the proven facts in this case exonerates the defendant. I fail to be able to understand how, under the facts of this case, the defendant company could have reasonably anticipated an existing fact of which it had not the slightest knowledge, viz., a trap under the east side of the culvert and, also, the fact that the underground drainage system drained into the trap. The defendant company would have had to know this or to have been charged with the knowledge before it could anticipate any danger after it was put into the catch basin. Neither do I see that the defendant company should have anticipated, reasonably likely to follow as a natural and ordinary consequence of the spilling of the gas and properly and safely washing it down into the catch basin and underground drainage system, that the gasoline would be drained into a trap entirely due to the negligence of the city of Opelousas, or that it would be exposed to the negligent act of striking or throwing a match into it.
As to the citations from Vol. 65, C.J.S. Verbo Negligence § 112, p. 700, I am of the opinion that the beginning of the quote is applicable rather than the quote in the majority opinion. This section begins with the following and I quote: “A manufacturer’s liability for negligence in disposing of a dangerous product or the liability of the original seller of goods and chattels may -be broken by the intervention of a superseding cause, such as some negligence or fault of another whereby the original negligence ceases to be the proximate cause of the injury * * If there was any negligence in spilling the gasoline, the fault of the City of Opelousas in maintaining or allowing to exist an inherently, potentially, and in actuality a dangerous condition or trap as an integral part of its underground drainage system, completely without the knowledge of the defendant or any member of the public using same insofar as the facts are revealed in this record, and of the deceased Boutte and Williams, in attempting to smoke, became the proximate cause of the explosion, fire and deaths. As to the applicability of the quoted portion in the majority opinion which states: “* * * but a person who has caused a dangerous instrumentality to be placed in a position where it may effect injurious results to others is answerable for such injuries as may ensue in the ordinary course of events even though an intervening cause serves as a condition on which the dangerous instrumentality may have acted to effect the injuries.” The gasoline which was spilled was not placed in any position within the knowledge of the defendant where it could effect injurious results to others. For this to have been applicable, it would have been necessary to prove that the defendant knew that the underground drainage emptied under the east side partition of the culvert or bridge crossing Landry Street and that this east side partition, through the negligence of the City of Opelousas, had been allowed to become a trap by virtue of a dam which blocked the southern entrance and one which blocked the northern exit of this east side partition.
As to the quotation from American Jurisprudence, Vol. 38, Sec. 70, p. 726, an application of its provisions under the facts of this case relieves the defendant company of any liability, for the intervening causes for this accident could not possibly have been foreseen or reasonably have been fore *561 seen by the defendant company or its employee, Tillson. One cannot foresee or be reasonably be expected to foresee that which depends upon a condition of which he has absolutely no knowledge, in this case, viz., the emptying of the public underground drainage system into a complete trap, or that anyone would be under the bridge smoking and striking a match. The defendant company did not know where the drainage system emptied and did not know that there was a trap in the east side partition. They had no way of knowing where the gasoline and water went after it went into the underground system.
The majority opinion further states: “Certainly, in washing the gasoline into the storm sewer, a reasonable person could foresee explosion or fire.” Defendants who have spilled gasoline and have not even removed it have been relieved of liability where someone comes and throws a match down near it, or into it, on the ground, that it is not reasonably expected or foreseeable that such would happen. It appears to me from the facts in this case that the contrary would be foreseeable, anticipated and expected where it is completely washed off of the surface of the ground, so to speak, and placed in an underground drainage system, one would have a right to expect and believe that he had placed it in the safest place, away from human contacts, and had it not been for the defective and dangerous condition of the public drainage system of the City of Opelousas this accident would never have occurred because all of this waste material accumulated there would have long since been gone and deteriorated and scattered, and the gasoline and water which came from the spillage at the defendant’s gasoline station would also have been dissipated and even the striking of a match would not have caused any explosion. All danger would have washed away with the running water.
I am aware of the fact that the majority opinion did not depend upon the Fontenot case but preferred to rest under Article 2315 of our LSA-Civil Code. Further comment by me is unnecessary as my entire dissent is based upon tort liability rather than any absolute liability without fault as it is not applicable in a tort case.
For the above and foregoing reasons, I am of the opinion that the judgment'should be reversed and the plaintiff’s suit dismissed at his cost.
I, therefore, respectfully dissent.